To please the court, Richard Lindstrom for defendants below in both causes. I'd like to reserve five minutes for rebuttal, your honors. You may, if you watch the clock. We would initially urge that all the claims that involved the supervisory aspects of what happened here should have been screened under the medical screening panel, which was in effect at the time. And the application of Jones v. Wilkin really would indicate that when you have a chain of causation or court fees, if you will, that it doesn't involve an intentional tort, that the screening panel would be implicated at that point. The negligent hiring, the negligent training, and the negligent supervision are not intentional acts. And this is not an arbitrary division either, because if you look at truck insurance exchange, as to the policy behind the screening panel, it's increased insurance rates. While intentional torts probably wouldn't be covered under a malpractice policy, they'd probably fade off into some kind of assault or something of that nature. So it's logical that all of these activities that involve first hands-on treatment by a doctor and then the ancillary parts of it involve medical malpractice. It's not because of the terminology involved. It's because of the chain of causation in negligence. So then Humphrey's reply that Nevada recognizes the torts of negligent hiring, training, and supervision are all very true. But it's not relevant in the situation where they involve the provision of medical care. In other words, these are fine standalone torts, but still it was very clear by 1995, at any case, that the screening panel was implicated. I need some clarification here of how this works. We have this statute that's been repealed. So when the case first arose and was filed, the statute had this provision for screening before the panels, correct? Correct. All right, and it was for malpractice claims, correct? Correct. All right, or medical malpractice claims. Now, what did Nevada argue with respect? What did you argue should have been screened, both the negligence and the negligent supervision at that point? That's correct. All right. And is it your understanding that the requirement for screening is jurisdictional, or is it discretionary? In other words, it's a failure to exhaust that the district court could have waived. I think it was clear at that point that under Jones v. Wilkins that it was jurisdictional, the prior law. And then the question comes in, well, what are the implications of that now if we were to be successful in where we are? And we did address that in our letter brief. And what we would indicate is clearly the requirement to attach an affidavit is jurisdictional at this point because the law provides that the case shall be dismissed if it's not attached. The next question asked by the court at that point was, well, what about the conference that's supposed to be held? Is that jurisdictional? I think it would be very hard to say that it is because there's a range of remedies for not having it. On the other hand, the entire scheme that replaced the screening may be taken as jurisdictional. So I don't know really which way that goes because when you think about it, if the purpose is to expedite the claims, and the entire legislative history, such as it is, was actually attached by both parties in our letter briefs, it does appear that the court's concerns in truck insurance exchange, that it was a response to the insurance and all that, were vindicated by the legislature later in saying, well, this is a better way to do it. But you can't have that conference unless you have the affidavit attached, which really goes to another issue asked by the court for the letter brief, and that is, well, hasn't he substantially complied then by having the testimony under oath of the doctor at the hearing? And the answer is no for a number of them. Aside from the fact that he doesn't come up with the conclusions that would be needed in the affidavit, and he probably was not qualified properly as wouldn't have been an expert for the affidavit, it also defeats the purpose of the process because you need to have that statement attached so you can have the expediting conference so that the effects of what is clearly jurisdictional as far as the affidavit being attached can go forward. Now, the provision applies, the statute applies, I believe, if the defendant is a hospital. Isn't that correct? That's correct. Okay. Hospital is defined as an establishment for the diagnosis, care, and treatment of human illness, including care available 24 hours each day from persons licensed to practice professional nursing who are under the direction of a physician, services of a medical laboratory, and medical radiological, dietary, and pharmaceutical services. Does the clinic meet those terms? I don't think the common sense, I don't think anybody would assume that the prison infirmary is necessarily meant to be defined as a hospital, as that statute says, but I don't think it's critical to what we're saying. What we're saying is, no, it's because it involved that the alleged lack of supervision training and all the rest was involved in the care by Dr. Bass. It's not that we're trying to say, no, this is a hospital. It's more that there's that chain of causation that involves medical malpractice. But isn't that what we're talking about, the supervision by whom? And if it's limited to supervision by a hospital, that's one thing, but supervision by a prison? Well, except hospitals arguably are not in a supervisory mode necessarily with the doctors, or at least that's not the basis for them being included necessarily in the Chapter 41A. I mean, they also have their own independent responsibilities and liabilities for malpractice, aside from just supervising physicians. I mean, they can lose the records, for instance, or they can negligently maintain records, which would be medical malpractice under the case law in Nevada. So they may be negligent in terms of supervising doctors, but hospitals can have their own separate negligence for provision of health care. And maybe the problem is the terminology. We talk about medical malpractice, but we're actually talking about health care provision malpractice when you look at the way they've defined it because, as you say, a hospital can have its own independent liability for it, whether it had anything to do with the doctor or not. So I would argue that those are distinct and could have been a different basis for liability but weren't in this case. I would then like to move on to the question of Dr. Romaldi even testifying as an expert. I mean, as the case progressed from, you know, by 1999, 2000, 2001, there never was an expert. We knew Dr. Romaldi was a treating physician. He was deposed as a treating physician with no expert's report and having not even reviewed all the medical records apparently from the deposition. And so there really was no even substantial compliance with the requirement that we have notification of this expert. And then I guess one could say, well, no harm, no foul, other than the deposition was not able to be taken properly. He was not able to be impeached with his statement. We could then not have another doctor look at the statement. And so it really then bleeds into the ultimate problem in terms of negligent supervision claims, and that is there was insufficient evidence of them because really all we got down to is Dr. Romaldi was uncertain. He couldn't really say that there was causation for plaintiff's injuries from the malpractice. Dr. Goldsmith was certain that it did not. And so if you look at cases like Jane v. McFarland, as a general rule, the plaintiff needs to have some kind of expert testimony to establish medical malpractice. So now we have the situation where we have somebody who comes in at the last second, supposedly is going to establish the causation, but then actually at trial says he can't really say that it was. Well, if that's the case, how are we left then with other than apparently the district court's kind of lay opinion that Dr. Bass didn't sound like he was somebody that anybody would want to have working on him, which we don't necessarily disagree with, but it's not proven. What did Dr. Romaldi say? It's at the extracts of record on page 21. And in essence, he said he didn't know. And I think his exact words were, there's a lot about this I don't know. And because of the questions, we're going to standard of care. Would it be a violation of the standard of care to use the sling to immobilize as opposed to some other treatment? And then because clearly Romaldi was of the opinion, no, that was not what he would have done. But then the question is, was that a violation of the standard of care? He could not opine as to that. And that's where the problem of having him as a treating as opposed to an expert comes into play. Right at that juncture where he goes beyond, he shouldn't have been in the sling as opposed to having that relate to the standard of care. I have a couple of problems with your arguments about Dr. Romaldi. One is the fact that you relied on an unpublished decision of this court, Crookshank. I saw that. Yeah. And so leveraging off of that, I was a little concerned. And then looking at the record, it indicates that you all entered into some kind of understanding that you were going to be able to work this out, I think, as it said. And I don't know if you were the trial attorney, but if Romaldi was allowed to testify, then you got to put Dr. Goldsmith on. Okay? Yeah, I think the problem with that is, and that's why I didn't argue the unpublished thing today. I didn't really realize it was in the brief until it was filed with the court. The person who is trying the case now is actually at trial. When they did the final stipulated changes to the pretrial order on the day of trial, no mention was made of an expert. And now it's pretty clear the court is going to let him testify. The poor person representing the state basically is in the situation saying, well, Judge, if you're going to do that, at least let me have Goldsmith. So I think he's, at that point, doing the best he can, but I don't think that mitigates the problem that occurs when you let this happen. And it's bad policy because ultimately what any wily plaintiff's lawyer now is going to do is try to slide by with just using the treating. What's our standard of review on this? Clearly erroneous. So you think what happened here rises to that level? We believe it does. It clearly is erroneous to have allowed that. Okay. And finally, I'd just like to address briefly the summary judgment on the 1983 claims. And would indicate that the underlying principle in plaintiff's arguments are is that somehow this negligence rose to the level of a constitutional violation. And it's very clear that normal medical negligence will not do so. Even gross negligence will not do so. And so we pretty much rely on the brief in that. And then I would at this time express our regrets for having cited the unpublished opinion. Okay. Mr. Lindstrom? I'm sorry. I'm looking to catch you guys in reverse. I'm sorry, Mr. Bach. Mr. Lindstrom was just before us. If you may please inquire. I'm Jason Bach on behalf of the plaintiff appellee and cross-appellant, Forrest Humphrey in this case. If I could first address the issue of the district court's finding of negligence supervision and the state's argument that this matter should never have even reached the trial phase because of the Nevada statute which requires that medical malpractice claims go before a medical screening panel. That statute applies to doctors and it applies to hospitals. The state has just said that a department of prisons is not a hospital. It's certainly not a doctor. It simply does not apply to them. Right. But it does apply to Dr. Bass. It does apply to doctors, but it doesn't apply to the state. Okay. And the finding by the district court that the state was or had committed negligent supervision, there is no statute at that time that would have permitted that action to go before a medical screening panel. In regards to the summary judgment motion that was granted by the district court, we're asking that this court reverse the decision of the district court under Estelle v. Gamble and also a recent decision by this court that I submit here today, Hummett v. Gomez. I'm sorry? You submit it today? Well, which I am submitting here today. Did you provide notice of this to counsel? I did not. All right. Well, give us the site. Sure. The site is 298 F. 3rd, 898. And I believe that Judge Hugg was a member of that panel. What was the name of the case? Clemmett v. Gomez. Normally the practice is to provide notice to counsel, even if you find it the day of, then you at least provide them with the written notice. Certainly. I apologize for that. It's also a procedure that you at this stage give it to the clerk, the citation, the name of the case, and also give a copy of that to opposing counsel. Certainly. All right. Getting back to the summary judgment, in reference to Dr. Bass, Dr. Bass. Excuse me. I just want to get one question on this statute. Do you agree or disagree with the State's suggestion that the statute, the screening statute, is jurisdictional? Yes. It is jurisdictional. The screening statute is jurisdictional. It just simply doesn't apply in this case. Okay. Dr. Bass denied medical care to Humphrey on a number of occasions over several weeks. Despite the fact that Humphrey lost the use of his arm, despite the fact that Mr. Humphrey requested on a number of occasions to see an orthopedic specialist, Bass simply refused to do so. At the time of the summary judgment motion, all we knew was simply that Dr. Bass, for some reason or another, was refusing medical care. At trial, we would come to find out the real reason why he denied medical care. Dr. Bass testified that Mr. Humphrey had filed a complaint against him before the Board of Medical Examiners and that he simply, as a result of that complaint, was not going to provide any more medical care. That's deliberate indifference. That was never allowed to be addressed at trial in regards to the civil rights action because the summary judgment had already been granted as to the summary judgment against Dr. Bass. Bass also testified at trial that he prevented Mr. Humphrey from seeing Dr. Serpestini, who was the specialist that Mr. Humphrey eventually got to see, because Bass was under the impression that Humphrey had filed a complaint against Dr. Serpestini as well. So not only is he denying medical care to Mr. Humphrey, based on essentially retaliation for Mr. Humphrey filing a complaint against him, he's also preventing Mr. Humphrey from seeing a specialist who had recommended that he go back to UNC. It's our argument that that is very clearly deliberate indifference and we should have been able to go to trial on that issue. As to Dr. Kaiser, who was the medical director of the prison at that time, Humphrey put Kaiser on actual notice on a number of occasions by sending letters, grievances to Dr. Kaiser telling him, look, I'm not getting the medical attention I need. There's something wrong here. Please do something about it. Kaiser did nothing about it. He was on actual notice of what was going on and just chose not to do anything about it. Again, deliberate indifference. Leon Smith, who was the associate warden of the prison at that time, Humphrey again made repeated letters and grievance forms to Mr. Smith requesting medical care. These forms were attached to our opposition for motion for summary judgment where Mr. Smith replied, you don't need medical care. I'm not going to allow you to see a specialist. Again, Mr. Smith was on notice. He chose not to do anything. Deliberate indifference. Keep in mind, we have read your briefs, so what we're looking for is new information here. All right. It's the same with Ron Angelo as well. Getting back again to the court's finding of negligent supervision, we believe that the court's decision was well-founded. When Dr. Bass was hired, Dr. Kaiser testified that he was aware of Dr. Bass's history and his problematic history and the fact that he had been reprimanded on a number of occasions by the Board of Medical Examiners. He's a staff doctor assigned to the? He's the medical director. The medical director. Yes. He does seem to have a checkered history. He certainly does. And the district court in the findings of law, or the conclusion of law finding the fact, pointed out that Kaiser and the state was aware of the fact that Dr. Bass had been found guilty of gross negligence in the past for the death of a woman undergoing laparoscopic surgery, that the board, in fact, revoked Bass's medical license at one point for repeated malpractice, and nonetheless, the state chose to hire Bass. And so they were certainly on notice that he was a problematic doctor and that he needed to be supervised very closely. They didn't do that. As evidenced by the fact that my client, Mr. Humphrey, submitted numerous requests to the medical director, to the associate warden, and still nothing was done, it's apparent that the state simply was not closely supervising Dr. Bass in his capacity. The court concluded that, well, here. The district court found that what they said was, Dr. Bass has a history of reprimands and suspensions from the Nevada Board of Medical Examiners. His combative approach to regulatory and other authority was evident at trial. As was the need for close supervision for someone with such attitude. The court concluded that his failure to respond to provide Humphrey with competent medical care was reasonably foreseeable. What was the testimony upon which you rely to find that Bass, Dr. Bass, had been guilty of malpractice? In the past or in this case? This case. The fact that, I mean, the testimony of the plaintiff that he continually went to Dr. Bass on a number of occasions and asked him for medical care and was simply denied that medical care, told, oh, you'll be okay, or refusing to allow him to see an orthopedic surgeon, and also the testimony of Dr. Romaldi who testified that the care that Mr. Humphrey received was simply inadequate. That, I guess, is a question I'm really asking because your opposing counsel said that Dr. Romaldi had never said that the treatment that Bass gave him, Dr. Bass gave him, was not in accordance with the standard of care. I believe what Dr. Romaldi actually said was that he could testify that the treatment that Mr. Humphrey received was below the standard of care, whether or not he couldn't conclusively say to what degree it affected his permanent injuries. Whether or not Mr. Humphrey would be in the same state that he is now had he received medical care at that time. It was just simply impossible to tell after so much time had passed what type of improvement in mobility Mr. Humphrey would have had had he received the care he should have gotten in the first place. But he did say it was below the standard of care. Yes. Turning to Offendant Palmer who the district court determined that the actions of Offendant Palmer was not deliberately indifferent. Palmer testified at trial that he had heard the verbal altercation, that he responded to the scene of where he heard the verbal altercation, saw that the toilet had been knocked off its hinges and was leaking water, fairly evident that a physical altercation had taken place, yet he testified at trial that he did not follow policy, which the policy was that if an altercation such as that takes place, you take the inmates to the infirmary to have them checked out to see if there's any medical issues. He simply did not do that. He also failed to file a report which was also required by a departmental policy. He simply turned a blind eye and did not take Humphrey to the infirmary as he was required to do so, by their own policy. Did Mr. Humphrey resist in any way going to the infirmary? He didn't specifically request medical attention at that time, but he did not resist going to the infirmary. For that reason, we believe that the testimony that Mr. Palmer gave suggests that, in fact, he was deliberately indifferent. Finally, I just want to address the issue of damages in this case. The district court awarded Mr. Humphrey $30,000 in lost wages. The testimony at the trial suggested that his lost wages were more in the range of $108,000. The big difference between $30,000 and $108,000. We would ask that that amount be modified by this court to reflect the amount of actual lost damages that Mr. Humphrey sustained. In addition to that, the court rejected the plaintiff's request for attorney's fees pursuant to 42 U.S.C. 1988. The plaintiff did ask for those attorney's fees in their post-trial brief. Those attorney's fees were not awarded. It's our position that Mr. Humphrey is entitled to those fees simply because he did bring a viable 1983 cause of action before the court. The court was not successful on it, but they're citing to the case that was cited in their brief, Southwest versus, I can't recall who it's versus, but citing to that case, the plaintiff doesn't have to be successful on his 1983 claim in order to be awarded attorney's fees. He brought a viable 1983 claim that made it to trial, was not successful on that claim, but was successful on the claim for negligent supervision. For that reason, we ask that he be awarded attorney's fees pursuant to 1988 as well. I reserve the remainder of my time. Well, your time is done, so you don't get another bite at the apple, but I think we've got your arguments. All right. Thank you. Thank you very much. We would suggest that you do have to prevail to some extent on a 1983 action to obtain the attorney's fees. We'd also suggest, once again, that there's no provision for additure federally, and they haven't met the requirements to change the judgment under State law. And finally, I don't recall anything in the record on appeal relative to these numbers not being adequate or accurate. And I would urge the court to look at the extradited records, pages 21 and 22, the testimonies of Dr. Romaldi and Dr. Goldsmith, because that's critical. If there is no causation and or the standard of care was not breached, there cannot be, then, the negligent supervision and medical malpractice. Because the district court found very clearly that if Dr. Bass has to be negligent in order for the negligent supervision, negligent training, and the rest of it to occur. That's a logical sequence. And that logical sequence also contradicts the rationale for not having things screened. Because clearly, if it's of a piece that Dr. Bass's malpractice was essential to have the liability on the State's part, it's obviously then related to medical malpractice. And this is distinct from the liability, I must say, of hospitals or other medical care providers. It's not because we're not saying that the State, it's not because the State's a pseudo-hospital or not. It's because any of the supervision, training, and the rest was related to the alleged malpractice. And therefore, under the statute, it should come in. And what's very illustrative of that is the Jones case, where here it's negligent maintenance of medical records that somehow then cause a negligent misrepresentation to be made to an employer. Same kind of thing. If you don't have the hands-on contact with the patient, then you don't have the rest of it. So clearly, a person who's keeping medical records somewhere at a medical clinic, who has to have their, is somebody whose activities have to be screened, it's pretty clear that the doctors that are supervising Dr. Bass need to be screened. And I would make a correction. Dr. Bass has never been the medical director. He was a staff doctor at that particular facility. Okay. And so unless there are any other questions, I'd like to conclude. Judge Gibson, do you have any questions? No questions. All right. Thank you. The case just argued will be submitted. We thank counsel for their argument.
judges: Hug, Gibson , Fisher